UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**

-against-

13-CR-85 (SLT)

MIGUEL DEASIS and ANGELO RODRIGUEZ,

Defendants.
----------------------------------------------------------------x

**TOWNES, United States District Judge:**

Defendants, Angelo Rodriguez and Miguel Deasis, move, *inter alia*, to suppress certain items recovered from the vehicle which Mr. Deasis was driving and in which Mr. Rodriguez was the front seat passenger on the afternoon of November 14, 2012, as well as items recovered from their persons during this encounter. On September 5 and 12, 2014, this Court conducted a hearing with respect to defendants' suppression motions at which the government called New York City Police Detective Alfred Hernandez as its sole witness. The defendants did not testify nor call any witnesses. The Court finds the testimony of Detective Hernandez to be entirely credible, convincing and uncontroverted. Upon consideration of the parties' written submissions, including post-hearing supplemental briefing, as well as the hearing testimony and exhibits, the Court denied defendants' motions to suppress the evidence in their entirety on November 14, 2014. This Court's findings of fact and conclusions of law follow.

## FINDINGS OF FACT

Detective Hernandez is a twenty-eight year veteran of the New York City Police Department, and, for more than six years, he has been assigned to the New York Drug Enforcement Task Force, which is comprised of special agents of the Drug Enforcement Administration, investigators employed by the New York State Police and detectives and

supervisors employed by the New York City Police Department. Members of the task force work in teams. Hernandez is assigned to Task Force Division Group number eleven ("Group T-11").

On or near November 14, 2012, a confidential informant ("CI") provided information to Group T-11 that an organization in Colombia, South America, was seeking to get proceeds from the sale of its narcotics in the United States transported to the owners of the drugs in Colombia. Prior to providing this information, the CI had provided reliable information about the laundering of drug money to South American countries. In this case, the CI supplied the telephone number, 917-573-4024 ("the target number"), of individuals in New York who had possession of narcotics proceeds awaiting transport to its owners in Colombia.

The telephone number was then given to a special agent working in an undercover capacity ("UC") who has worked with Group T-11 in more than 50 money laundering investigations. The UC called the target number on the morning of November 14, 2012, at approximately 9 a.m. The UC, who speaks Spanish, reported to his supervisor that he spoke to a Hispanic male whom he believed was a Mexican national. This male informed the UC to contact a Dominican male at the target number later to discuss his pick-up of money in the afternoon. They agreed that the money would be delivered to the UC at around 2 p.m.

At approximately 1:15 that afternoon, the UC called the target number and a male the UC described as a Hispanic male of Dominican origin answered. At the suggestion of the UC, the speakers agreed that the money pick-up would occur at the K-Mart Shopping Center located at Bruckner Boulevard and White Plains Road, a location that covers several blocks and contains parking areas, numerous stores and restaurants on roads that cross with numerous exits and access to the Bruckner Expressway and the Cross Bronx Expressway. The speaker informed the

UC that a person other than the speaker would be bringing the money to the UC. As with every conversation the UC had about the money pick-up, he relayed the sum and substance of his conversations to his supervisor at Group T-11.

Hernandez, and other members of Group T-11, set up in the K-Mart Shopping Center in an attempt to identify the person delivering the money before he met the UC. Some team members sat in parked vehicles while others drove around the lot with the flow of traffic. A member of the surveillance team, Special Agent Peter Feehan, relayed from his vehicle that he observed a male, later identified as Miguel Deasis, walking from a vehicle toward Radio Shack. He was carrying a gray Kohl's shopping bag in which Feehan could see a yellow box on which there was a picture of a kitchen knife set. After Feehan reported that Deasis had entered the store, the surveillance supervisor radioed that the UC had just received a call from a third person, a second Dominican male, using the telephone with the target number who informed the UC that he was inside Radio Shack ready to make the delivery. The UC went to the Radio Shack, called the target number and told the individual he was in front of the store. At about 3:10 p.m., Hernandez observed Deasis exit and meet the UC outside in front of the store. They shook hands and had a brief conversation before Deasis handed the UC the gray Kohl's shopping bag with the yellow box inside. The two then left in different directions. Deasis, carrying what appeared to be a cellphone, walked back to the parking lot and entered a 2010 gray Jeep Liberty with New York plate FZY 9804.

As Deasis drove away, some members of the surveillance team, including Hernandez, followed the vehicle out of the shopping center. Others followed the UC and met with him about the just-concluded transaction with Deasis. They also recovered and inspected the yellow box.

It contained $150,000 in United States currency in three bundles of heat-sealed, vacuum-packed stacks of what appeared to be $50,000 each.

Hernandez and other members of the team followed the Jeep Liberty that Deasis was driving until it made a left turn into the driveway at 249 Concord Road in Yonkers, New York, at approximately 4:10 p.m. Hernandez, alone in his vehicle, parked on the street in order to continue to watch that location using binoculars.

Within five minutes after Deasis entered the house at that location, the team was notified that the UC had received a call from the Mexican national to whom the UC had first spoken to set up the money deliveries that day. Using the telephone with the target number, the male informed that money was still being prepared and that there would be at least two more deliveries.

Approximately 35 minutes later, the UC relayed that he had received a second call from the Mexican national informing that the same individual, later identified as Deasis, would return to the same meeting place to drop off items to the UC. Shortly thereafter, Hernandez observed Deasis, along with another male later identified as Angelo Rodriguez, leave 249 Concord Road and approach the Jeep Liberty parked in the driveway. Deasis was carrying a white box that was approximately the same size as the yellow box he had dropped off earlier. Rodriguez was also carrying a white box, with some color to it, that was approximately the same size as the box that Deasis carried. Both men went to the vehicle's passenger side door, opened it and then remained there for several minutes. Deasis, who no longer carried the white box, then went to the driver's side and entered that door while the front passenger door remained open. Deasis exited the driver's door and returned to the passenger side where he entered the vehicle but soon got back out. Both men, now empty handed, went back to the front of the house. They then returned to

the vehicle accompanied by a third Hispanic male, later identified as Hector Gamez Parra, a Mexican national. All three men walked to the passenger side of the Jeep Liberty where they remained for a brief time. Gamez Parra then walked back towards the entrance of the house. Deasis entered the driver's seat and Rodriguez was in the front passenger seat. Some members of the team were directed by the group supervisor to remain at the house while others, including Hernandez, were directed to follow Deasis and Rodriguez.

Team members followed the defendants until they were travelling on Bruckner Boulevard Expressway heading southbound in the direction of the K-Mart Shopping Center. The UC relayed that he was in contact with the target telephone and was informed that they were on their way to meet him, but they were stuck in traffic. Hernandez observed the Jeep Liberty exit from the Bruckner Expressway onto White Plains Road. The K-Mart Shopping Center was located on the other side of the expressway at Bruckner Boulevard and White Plains Road.

Using their car lights, team members Detective Kearney and Special Agent Feehan signaled for the car to pull over at a Shell Gas Station across from the shopping center. Kearney approached the driver's side, Feehan approached the passenger side and Hernandez stayed toward the rear driver's side of the Jeep Liberty. Although the defendants were told they were stopped because their vehicle's tinted windows were too dark, Hernandez admitted that the traffic stop and the events that followed were a "ruse" as the stop was undertaken to mislead defendants as to the true basis of the team's probable cause.

Without any guns being drawn, Kearney asked Deasis for his license and registration for the vehicle. He then had a conversation with both men during which he asked where they were headed. He also asked them if there was any contraband such as guns, drugs or money in the vehicle. Finally he asked for consent to search the vehicle. Hernandez did not hear either

defendant respond.  He believed, however, that consent to search was given because he heard Kearney say "Okay, so we're good, so we can search."  Further, Kearney informed Hernandez that Deasis had consented to the search.  As part of the ruse, Kearney asked Hernandez to do a computer check using Deasis' license and registration.  The defendants were asked to step out of the vehicle and go to the curb.  Kearney walked Deasis and Rodriguez to the curb and stood by them while Feehan searched the front area from the passenger side and Hernandez searched the rear seat area from the driver's side.

Recovered during the search were five cell phones located in the center console area between the driver and front passenger seats.  On the back seat, Hernandez observed and looked into the two white boxes that he had seen the defendants carry to the vehicle earlier.  Each box was empty.  A concealment area was found inside the vehicle located in a rear compartment behind the back seats.  It was a natural compartment that came with the vehicle but had been altered so that the cover could not be raised without activation of some type of mechanism.  Team members used a crowbar to pull the cover up enough to get a member's arm inside and remove six vacuum and heat sealed plastic wrapped bundles of United States currency.  Each package contained $50,000 for a total of $300,000.

Kearney asked each defendant if the recovered money belonged to him.  Deasis said no and Rodriguez shook his head.  Both defendants were told they were under arrest and each was then handcuffed.

Team member, Special Agent Aguilera, searched each defendant after arrest.  He recovered documents from each of them along with an iPhone from Rodriguez and a BlackBerry from Deasis.

## CONCLUSIONS OF LAW

"Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (quoting *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004)). "Furthermore, when the police possess probable cause to believe a vehicle contains contraband, 'they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle.'" *Id.* (quoting *United States v. Cruz,* 834 F.2d 47, 51 (2d Cir. 1987)).

Probable cause is a "practical," "common-sensical" "all things considered" standard. *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013). "The determination of whether probable cause . . . exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts because the various law enforcement officers in this investigation were in communication with each other." *United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987) (citing *United States v. Tussa*, 816 F.2d 58, 63 (2d Cir. 1987)).

Here, the information that Group T-11 team members had available to them at the time of the search of defendants' vehicle included the target telephone number provided by a confidential informant who had provided reliable information to law enforcement in the past; the information relayed to the team members by the UC regarding his telephone contacts with the three men in possession of the drug proceeds; the concurrent observations of the surveillance team members who were following the defendants; the debriefing and recovery of $150,000 passed from Deasis to the UC; and observations of preparations for the second transfer of currency by three men as described by the UC. As the criminal activity unfolded, law

enforcement were witnesses to the planning because the UC communicated these plans. The team members were witnesses to the actual execution of those plans as reported by members of the surveillance team. The findings of fact in this case provided probable cause to stop the vehicle and to open and search all of it regardless of whether the defendants consented to the search.

After arresting the defendants, each was searched and items were recovered from their persons. The searches were incident to arrest and therefore proper. *See United States v. Bailey*, 743 F.3d 322, 339 (2d Cir. 2014) (citing *Smith v. Ohio*, 494 U.S. 541, 543 (1990)).

After considering the totality of the circumstances in this case, this Court is satisfied that the collective knowledge of the team provided the arresting officers with probable cause to search the vehicle and to break open the compartment from which the money was recovered.

## *CONCLUSION*

For the reasons set forth above, the motions to suppress property are denied in their entirety.

**SO ORDERED.**

                                                                              _____S/_____
                                                                              SANDRA L. TOWNES
                                                                              United States District Judge

Dated: March 27, 2015
       Brooklyn, New York